**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA, ex**
**rel. GREGORY KERSULIS, M.D., and**
**JIMMIE WILSON; GREGORY KERSULIS,**
**M.D.; and JIMMIE WILSON**                                             **PLAINTIFFS**


**v.**                                **CASE NO. 4:00-CV-00636 GTE**

**REHABCARE GROUP, INC., and**
**BAXTER COUNTY REGIONAL**
**HOSPITAL, INC.**                                                        **DEFENDANTS**

<u>**MEMORANDUM AND ORDER**</u>

Presently before the Court are the Motions for Summary Judgment filed by Separate

Defendants RehabCare, Inc. ("RehabCare") and Baxter County Regional Hospital, Inc. ("BCH"),

RehabCare Group, Inc's Motion to Exclude Reports and Testimony of Plaintiffs' Expert, and

Baxter County Regional Hospital's Motion for Adoption of RehabCare Group, Inc.'s Motion to

Exclude Reports and Testimony of Plaintiffs' Expert.

**I.  Background**

RehabCare manages acute rehabilitation units throughout the country and has managed

and staffed the acute rehabilitation unit ("ARU") at BCH since December 1996.  Dr. Kersulis, a

neurologist, worked as the medical director for RehabCare's rehabilitation unit at Baxter County

Regional Hospital from October 1997 until his termination in June of 2000.  Mr. Wilson is a

licensed physical therapist and worked in that capacity for BCH from January 1994 until his

termination in June of 2000.  From January 1997 through June 2000, Wilson served as "charge

physical therapist" at RehabCare's BCH facility.

1

Defendants treat patients covered by Medicare and, therefore, receive reimbursement for Medicare claims from the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Finance Division ("HCFA"), an agency within the United States Department of Health and Human Services (hereinafter "HCFA/CMS"). CMS and HCFA, in turn, typically contracts with private insurance intermediaries and carriers to administer and pay for claims from the Medicare Trust Fund. In Arkansas, HCFA/CMS contracts with Arkansas Blue Cross and Blue Shield to administer the payment of claims to Medicare providers. Pursuant to RehabCare's contract with BCH, RehabCare manages and staffs the ARU located within BCH's facilities. Under the terms of the contract, BCH submits all claims for medicare reimbursement for patients treated in the ARU.

The part of the Medicare program at issue here is "Part A," which provides basic insurance for the costs of hospitalization and post-hospitalization care. *See* 42 U.S.C. § 1395©-1395(I)-2 (1992). Medicare reimbursement under Part A is typically made under the "prospective payment system" ("PPS"). *See* 42 C.F.R. § 412.20. Under the PPS, a specific predetermined amount is paid for each inpatient hospital stay, based on each stay's "diagnosis-related group" ("DRG"). *See* 42 U.S.C. § 1395ww. If acute rehabilitation units meet certain requirements, they may become exempt from the PPS system and obtain reimbursement based on the reasonable cost of services provided to medicare patients. *See* 42 C.F.R. 412.20(b), 412.22. "Reasonable cost" reimbursement is typically more lucrative than reimbursement through the PPS system.

One of the requirements for exempting out of the PPS system and receiving reasonable cost reimbursement is known as the "75/25 rule." HCFA/CMS gave the fiscal intermediaries

("FIs") responsibility for assuring compliance with the 75/25 Rule.  Medicare regulations provide

that if a hospital is found to have violated the 75/25 rule, the hospital's payments will be

retroactively adjusted to account for the difference in what the hospital was paid under the

"reasonable cost" reimbursement and what the hospital should have been paid under the PPS

system.  42 C.F.R. § 412.130.  Under the 75/25 Rule, a hospital qualifies as a "rehabilitation

hospital" if, "during its most recent 12-month cost reporting period, it served an inpatient

population of whom at least 75 percent required intensive rehabilitation services for the treatment

of one or more" of the following conditions:

> (I) Stroke.
> (ii) Spinal cord injury.
> (iii) Congenital deformity.
> (iv) Amputation.
> (v) Major multiple trauma.
> (vi) Fracture of femur (hip fracture).
> (vii) Brain injury.
> (viii) Polyarthritis, including rheumatoid arthritis
> (ix) Neurological disorders, including multiple sclerosis, motor neuron diseases,
> polyneuropathy, muscular dystrophy, and Parkinson's disease.
> (x) Burns.

42 C.F.R. § 412.23(b)(2).  The regulation also requires that to be exempted out of the PPS system

the rehabilitation unit must "[h]ave beds physically separate from (that is, not commingled with)

the hospital's other beds."  42 C.F.R. § 412.25(a)(7).

In their Second Amended Complaint, filed July 18, 2005, the Relators (hereinafter

"Plaintiffs"), Gregory Kersulis, M.D. and Jimmie Wilson, bring Counts I-III on behalf and in the

name of the United States of America under the *qui tam* provisions of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729-3733.  In Counts I-III, the Plaintiffs assert that RehabCare and BCH

violated 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(3) by knowingly submitting false claims,

submitting false records in support of claims and conspiring to submit claims to the United States

Government under the Medicare program for reimbursement for acute rehabilitation services,

without complying with certain prerequisites for payment of such claims.  Specifically, the

Plaintiffs assert that although the Defendants submitted annual certifications and questionnaires,

or "self-attestations," that the BCH ARU qualified as a rehabilitation hospital exempt from the

PPS system and submitted claims on a "reasonable cost" basis, the Defendants did not in fact

qualify for reimbursement under the more lucrative "reasonable cost" basis.  Plaintiffs contend

BCH ARU did not qualify for an exemption because: (1) it did not comply with the requirement

that it have beds physically separate from (that is, not commingled with) the hospital's other

beds, and (2) it did not comply with the 75/25 Rule because some patients should have been

classified as 25 percent patients, but were improperly classified as 75 percent patients, and

"overflow patients" were not included in the 25 percent category. Plaintiff Wilson brings Count

IV against BCH on behalf of himself, individually, under the FCA whistle blower provision.

Count IV asserts that BCH terminated Wilson's employment because he confronted management

about the allegedly illegal Medicare claims and refused to go along with Defendants' allegedly

illegal conduct.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

[T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth

specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. Rule 56(e).  The

plain language of Rule 56© mandates the entry of summary judgment against a non-moving

party which, after adequate time for discovery, fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which that party will bear the burden of proof

at trial.  *Celotex Corp.*, 477 U.S. at 322.  The district court must base its determination regarding

the presence or absence of a material issue of fact on evidence that would be admissible at trial.

*Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993).

### III.  Defendant RehabCare's Motion for Summary Judgment and Defendant Baxter County Regional Hospital's Motion for Summary Judgment as to Counts I through III

Defendants[1] move for summary judgment on all claims asserted against RehabCare and

BCH (Counts I-III) in Plaintiffs' Second Amended Complaint.[2]  First, Defendants argue that they

are entitled to summary judgment on Counts I and II because there is no evidence to show that

the Defendants knowingly provided false information or caused false or fraudulent claims to be

submitted to the federal government.  Defendants argue that they are also entitled to summary

judgment on Count III because Plaintiffs cannot establish that Defendants knowingly submitted a

false statement or caused BCH to submit a false claim for payment to the federal government,

and therefore, Plaintiffs' conspiracy claims fail as a matter of law.

In Counts I through III, Plaintiffs principally rely on the "certification theory" of liability,

or "legally false certification," "which is predicated upon a false representation of compliance

---

[1]Defendant BCH adopts and incorporates Sections A and B of Defendant RehabCare's "Argument and Citation of Authority" in its separately-filed Memorandum of Law In Support of Motion For Summary Judgment pertaining to Counts I through III.

[2]Count IV of Plaintiffs' Second Amended Complaint is asserted only against Defendant BCH.

with a federal statute or regulation or a prescribed contractual term." *Mikes v. Straus*, 274 F.3d 687, 696-97 (2d. 2001). "Although the False Claims Act is 'not designed to reach every kind of fraud practiced on the Government,' *United States v. McNinch,* 356 U.S. at 599, 78 S. Ct. 950, it was intended to embrace at least some claims that suffer from legal falsehood." *Id.* Thus, a false claim may take the form of a claim for goods or services "*provided in violation of contract terms, specification, statute, or regulation.*" *Id.* (citing S. Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (emphasis added)). "Just as clearly, a claim for reimbursement made to the government is not legally false simply because the particular service furnished failed to comply with the mandates of a statute, regulation or contractual term that is only tangential to the service for which reimbursement is sought. Since the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay. Accordingly, while the Act is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government,' *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S. Ct. 959, 19 L. Ed.2d 1061 (1968), it does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." *Id.* (joining the Fourth, Fifth, Ninth, and District of Columbia Circuits in holding that a claim under the FCA is legally false only where a party certifies compliance with a statute or regulation as a <u>condition</u> to governmental payment).

## A. Prima Facie Case - Counts I and II

Count I asserts that Defendants violated section 3729(a)(1) of the False Claims Act ("FCA") by knowingly submitting false or fraudulent claims for payments or causing false or fraudulent claims for payment to be submitted to officials of the United States Government for

the cost reporting years 1998 through 2001.  Count II alleges that Defendants violated section

3729(a)(2) of the FCA by submitting false statements that BCH ARU was in compliance with the

75/25 Rule, and thus falsely representing that the unit was PPS exempt, to get BCH's claims for

the ARU paid at the higher cost reimbursement rate.

> 31 U.S.C. § 3729(a)(1) and (2) provide:
>
> Any person who--
> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the
> United States Government or a member of the Armed Forces of the United States
> a false or fraudulent claim for payment or approval; [or]
>
> **(2)** knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government;
>
> . . .
>
> is liable to the United States Government . . . ."

A prima facie case under 31 U.S.C. § 3729(a)(1) requires that "(1) the defendant made a claim

against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the

claim was false or fraudulent."  *United States ex rel. Quirk v. Madonna Towers, Inc*., 278 F.3d

765, 767 (8th Cir. 2002).  To establish a claim under 31 U.S.C. § 3729(a)(2), Plaintiffs must

demonstrate that Defendants knowingly made a false statement in order to get a false or

fraudulent claim paid.  *See United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*,

125 F.3d 899, 903 (5th Cir. 1997).  "'Knowingly' is defined by the FCA as meaning that a

person, with respect to information: (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information."  *Quirk*, 278 F.3d at 767 (citing 31 U.S.C. § 3729(b)).  "No

proof of specific intent to defraud the government is required."  *Id.*

"Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law . . . This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler v. Community Health Services of Crawford County, Inc*., 467 U.S. 51, 63, 104 S. Ct. 2218, 2225 (1984).[3] "As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement." *Id*. at 64, 104 S. Ct. at 2225-26. "A party cannot file a knowingly false claim on the assumption that the fiscal intermediary will correctly calculate the value in the review process. Such a result would shift the burden of cost calculation from the provider to the fiscal intermediary and encourage the filing of false claims, which is directly at odds with the stated goal of the FCA." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group*, *Inc.*, 400 F.3d 428, 447 (6th Cir. 2005) (citing *United States ex rel. Sarasola v. Aetna Life Ins. Co.,* 319 F.3d 1292, 1301 (11th Cir.2003) (holding that a fiscal intermediary is immune from liability for approving payment for allegedly fraudulent claims)).

However, "innocent mistakes and negligence are not offenses under the Act." *Quirk*, 278 F.3d at 767 (citing *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 464-65 (9th Cir.1999); *Hindo v. University of Health Sciences/The Chicago Med. Sch.,* 65 F.3d 608, 613 (7th Cir.1995) ("The requisite intent is the knowing presentation of what is known to be false. In short, the claim must be a lie.")). "The statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard.'" *United States ex rel. Hagood v. Sonoma County*

---

[3]The Court notes that this language arose in the context of an estoppel argument that the defendant made, and not in a False Claims Act case.

*Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). "To take advantage of a disputed legal question . . . is to be neither deliberately ignorant nor recklessly disregardful." *Id.* "The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

In *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768-69 (8th Cir. 2002), the Eighth Circuit affirmed the district court's grant of summary judgment because the evidence in the record indicated that the employees of the defendant considered the billing practice at issue "to be the generally accepted practice." The court stated that the only evidence offered by the plaintiff that the defendant knowingly submitted false claims to the government was the deposition testimony by facility officials that they did not seek legal advice concerning the propriety of their billing practices, and the plaintiff submitted no evidence suggesting that the defendant suspected something wrong but deliberately avoided learning more so that a fraudulent scheme could continue. *Id.* Specifically, the plaintiff submitted the deposition testimony of the administrator and chief financial officer of the defendant, which revealed that those officials did not seek legal advice, or an opinion from Medicare, concerning the billing practice. *Id.* The court found that such testimony did not demonstrate "'actual knowledge' of fraudulent billing practices, or even 'reckless disregard of the truth or falsity' of the submitted claims." *Id.* The court stated, "At most, the failure to secure a legal opinion concerning the billing practices might be characterized as acting in 'deliberate ignorance of the truth or falsity' of the submitted claims. However, failing to secure a legal opinion, without more, is not the type of deliberate ignorance

10

that can form the basis for a FCA lawsuit" because the officials had no reason to pursue a legal

opinion concerning the billing practices because "both of them considered the practice acceptable

standard procedure." *Id.* (internal citation omitted). The court stated that the officials'

understanding may not have been "legally correct," but noted that their decision was limited to

whether the defendant knowingly submitted false or fraudulent claims, not whether the submitted

claims were in fact false or fraudulent. *Id.* Furthermore, Plaintiffs did not offer any evidence to

refute the declarations of three of Defendants' administrators, the director of finance, the

assistant administrator, the chief financial officer, and the nursing care accounts receivable clerk,

all of whom declared that they did not have any knowledge that any false or fraudulent claims

were submitted to Medicare. *Id.*

Similarly, in *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d

1032, 1053 (8th Cir. 2002), the Eighth Circuit stated:

> The False Claims Act prohibits the *knowing* presentation of false claims for
> government payment or approval. 31 U.S.C. § 3729(a). The Act defines
> "knowing" and "knowingly" to mean that the actor had actual knowledge of the
> pertinent information or acted in deliberate ignorance or in reckless disregard of
> the truth or falsity of that information. Sec. 3729(b). The question on intent here is
> whether the defendants knew (or would have known absent deliberate blindness
> or reckless disregard) that their bills would lead the government to believe that
> they had provided services that they actually did not provide. If a statement
> alleged to be false is ambiguous, the government (or here, the relator) must
> establish the defendant's knowledge of the falsity of the statement, which it can do
> by introducing evidence of how the statement would have been understood in
> context. *See United States v. Garfinkel,* 29 F.3d 1253, 1256 (8th Cir.1994)
> ("evidence offered at trial could potentially resolve any ambiguity on the face of
> the document"); *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.1978) ("In
> light of these ambiguities ··· the government must negative any reasonable
> interpretation that would make the defendant's statement factually correct.");
> *United States v. Mackby,* 261 F.3d 821, 827 (9th Cir.2001) (False Claims Act
> violation consisted of filling in Medicare claim form contrary to instructions
> received in Medicare bulletins). If the Association shows the defendants certified

compliance with the regulation knowing that the HCFA interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the HCFA interpreted it, any possible ambiguity of the regulations is water under the bridge. However, it is important to remember that the standard for liability is knowing, not negligent, presentation of a false claim. *Oliver,* 195 F.3d at 464-65.

## B. Prima Facie Case - Count III

31 U.S.C. § 3729(a)(3) provides:

Any person who--
(**3**) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid

. . .

is liable to the United States Government . . . ."

To establish a conspiracy under 31 U.S.C. § 3729(a)(3), Plaintiffs must show (1) that the Defendants conspired with one another to get a false claim allowed or paid and (2) one or more conspirators performed any overt act in furtherance of the conspiracy. *United States ex rel. Sanders v. Allison Engine Co.*, 364 F. Supp. 2d 713, 714 (S.D. Ohio 2003) (citing *United States v. Murphy,* 937 F.2d 1032 (6th Cir.1991)).  In discussing the requirements to establish a conspiracy under 31 U.S.C. § 3729(a)(3), the Sixth Circuit stated,

A recent authoritative statement of what is required to prove a civil conspiracy is found in *Hooks v. Hooks,* 771 F.2d 935, 943-44 (6th Cir.1985):

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

12

The question of whether a person was a participant in a conspiracy is a question of fact. *See United States v. August,* 745 F.2d 400, 405 (6th Cir.1984) (criminal case); *Cf. Ghandi v. Police Dept. of Detroit,* 747 F.2d 338, 345 (6th Cir.1984) (recognizing that cases involving conspiracy allegations are not well suited to summary judgment).

. . .

resolution of this case requires a determination of Murphy's state of mind, *viz.,* whether he shared the conspiratorial objective.

*United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991).

### C.  Commingling Overflow Patients

Plaintiffs allege that Defendants did not comply with the condition of the PPS-exclusion that the beds in the ARU must be kept physically separate from the beds in the rest of the hospital, pursuant to 42 C.F.R. § 412.25(a)(7), which states:

> In order to be excluded from the prospective payment system, a . . . rehabilitation unit must meet the following requirements.
> . . .
> (7) Have beds physically separate from (that is, not commingled with) the hospital's other beds.

Plaintiffs allege that the Defendants failed to comply with this requirement from 1998 through 2001 by "routinely commingling beds in the acute care side with those in the ARU." They state that the BCH ARU consisted of 16 beds for most of that time and housed between 392 and 469 rehabilitation patients per year.  Plaintiffs allege that the BCH ARU was also occupied by the following number of "overflow patients," *i.e. acute care patients who did not have any rehabilitation diagnosis*: 14 patients in 1998, 122 in 1999, 25 in 2000, and 5 in 2001.[4]

---

[4]Plaintiffs' Statement of Opposition to Defendants' Motions for Summary Judgment, Exhibit (hereinafter "Plaintiffs' Exhibit") 13, Holdman Dep. p. 15.

Plaintiffs state that it "was generally accepted that in a rare public health emergency – for example, during a flu epidemic, where the hospital had no more beds available in the acute care unit but had to admit a patient on an emergency basis – the hospital could temporarily place the patient in a bed in the ARU.  In that situation, an Arkansas hospital was required to notify the Arkansas Department of Health of the situation and obtain approval to place the overflow patient in the ARU."  Plaintiffs further allege that Defendants were "well aware of the commingling rule, and that a hospital was not supposed to place acute care patients in the ARU, except under extraordinary circumstances and with the permission of government authorities."  In support of these assertions, Plaintiffs cite a 1997 document circulated to the units managed by RehabCare, which states:

> **Can acute care patients occupy the beds of an acute rehabilitation program or a transitional care program?  Can they be transferred from non-exempt to exempt beds and vice versa? [ARU and SNF]**
>
> No.  Both programs are distinct part programs meaning that they have been "set aside" in the cost accounting of the program.  To place non-appropriate patients in these beds constitutes a misuse of the special designation.[5]

Plaintiffs also cite a memorandum dated February 21, 1997 from RehabCare Program Director Renee Allen to Jeff Speaks, Chief Operating Officer of BCH, which states, "This is to inform you that due to continued acute care patient admissions to the Rehab unit we are now out of Medicare compliance and at risk of not qualifying for the PPS exemption."[6]  Mr. Speaks states that occasionally, generally during flu season when a high census period occurs, acute care

---

[5]Plaintiffs' Exhibit 14B, Bianchi Dep. Exhibit 7, "Many Questions: Medicare Questions and other Operational Issues" at BAX 105819.

[6]Plaintiffs' Exhibit 29C, Speaks Dep. Exhibit 259.

patients, who were not "rehab patients," were placed in the BCH ARU beds.[7]  Additionally, Rick

Shelton, a former Regional Vice-President for RehabCare that was responsible for the BCH ARU

in February of 1997, states that he never saw a copy of the Renee Allen memo to Jeff Speaks

because "[h]ad [he] seen it, [he] would have informed Renee that she was not accurate because

they were not at the end of the fiscal year."[8]

      Additionally, Plaintiffs submit the deposition of Bob Bianchi, a former Senior Vice

President for RehabCare who oversaw program services.  He states in his deposition that in a

hospital with five hundred patients in the rehab unit in a year, it is "a rare circumstance" to have

"overflow patients," and explains that a rehab unit would have overflow patients when "a

hospital got into a crisis situation, so to speak, too many patients coming into the emergency

room physicians wanting to admit, no more beds in-house.  And an administrator rightfully

would say, we've got to care for these people somewhere."[9]  When asked whether he was aware

of a situation where a hospital had four hundred rehab patients in a rehab unit for the years and

another hundred who are not there for the rehab program, Mr. Bianchi responded, "That would

be way out of any experience I've ever heard of for any program."[10]

      Plaintiffs rely on the testimony of several executives and employees of RehabCare in

support of their assertion that Defendants failed to comply with the requirement that the BCH

ARU have beds physically separate from the hospital's other beds.  When asked whether he

---

[7]Plaintiffs' Exhibit 29A, Speaks Dep. p. 32-33.

[8]Defendant BCH's Exhibit NN, Shelton Dep. p. 186.

[9]Plaintiffs' Exhibit 5B, Bianchi Dep. p. 266.

[10]*Id.*

recalled anyone raising the issue of overflow beds on the acute rehabilitation unit, Rick Shelton stated:

> "I raised it.  When I was made aware of it, I met with - - *we had a very strict, conservative rather, interpretation that this was not allowed*.  However, again, it's interpreted by each state.  And in the State of Arkansas the process was, you could overflow, but you had to notify the appropriate person at the state health department, explain the crisis you're having - - why you're overflowing. . . . we modified our data collection software to capture those patients [that were overflowing from the hospital into the rehab unit beds] in our overall data base because normally they would not be included.  They weren't admitted to rehab, but they would fall - - they were housed in those beds for maybe 24 hours.  So we were very conservative on that issue."[11]

However, Mr. Shelton could not recall when that modification to the system was made.[12]

Mr. Don Ickler, Program Director for RehabCare, identifies a document in his deposition that states that the BCH ARU "had six to eight acute care admissions, not rehabilitation admissions, acute care patients that were in our beds, our exempt beds.  And those patients, because they weren't rehabilitation admissions, they were never put into SCOUT, so they are not in this number [of patients included in the 75/25 Report] anywhere because they're not a rehabilitation admission."[13]  Then, Mr. Icker explains that his understanding of the process is that the State of Arkansas is notified that the BCH ARU is admitting non-rehab patients and that those patients should be billed as an "acute patient only," not as a rehab patient.[14]

---

[11]Plaintiffs' Exhibit 26, Shelton Dep. p. 184-85 (emphasis added).

[12]*Id*. at.185.

[13]Plaintiffs' Exhibit 15A, Ickler Dep. p. 132-33, Exhibit 123 at BAX 100232.

[14]Plaintiffs' Exhibit 15A, Ickler Dep. p. 134-35.

In the deposition of Ivan Holleman, Corporate Representative of BCH, the following

discussion took place:

> Q: So there were nurses who were specifically tasked only to take care of patients
> in the acute rehabilitation unit?
> A: I believe that that's true.  They did take care of overflow patients.
> Q: Who were in the  –
> A: Who were medical/surgical patients and not acute rehab patients.
> Q: So they took care of overflow patients while those patients were occupying
> beds in the acute rehabilitation unit?
> A: Correct.[15]

BCH provided RehabCare with a "face sheet" identifying any overflow patients on the unit.[16]

Mr. Holleman described the process to ensure appropriate documentation and accounting for

acute care patients that were placed in rehab unit beds:

> Belinda Aaron was given each day a face sheet which is essentially the
> information on the patients who are medial/surgical patients for purposes Annette
> Cully thought of entering and documenting into the SCOUT system.  We had two
> census tracking forms, one associated with ARU, one associated with med/surg
> unit that was adjacent to it.  The med/surg were accumulated and reported on the
> med/surg side of that equation, med/surg side with the reporting.  Annette worked
> to assure that supplies for the medical/surgical patients were taken from a specific
> supply closet and that they were not taken from a supply closet for the ARU
> patients.  Linens were separate.  And she routinely prorated the staffing if there
> were overflow patients.[17]

Mr. Holleman stated that BCH's concern regarding overflow of patients into the physically

separate ARU beds was that the costs needed to be allocated appropriately and that the patients

needed to be accounted for appropriately.[18]

---

[15]Plaintiffs' Exhibit 14A, Holleman Dep. p. 17-18.

[16]*Id*. at 42-46.

[17]*Id*. at 42-43.

[18]*Id*. at 42.

Plaintiffs also rely on the declaration of Ms. Wanda Theus, Director of the Medicare Certification Program for the Arkansas Department of Health during the period at issue (1998-2001), who was responsible for monitoring compliance with the conditions for exemption from PPS other than the 75/25 Rule.  Ms. Theus would approve the placement of a patient in a bed in the exempt rehabilitation unit for a specific, limited period of time in rare emergency situations involving "overflow patients."[19]  Ms. Theus understood that "on the rare occasion where a hospital placed an overflow patient in a bed in the exempt rehabilitation unit, the hospital was not supposed to include the patient as part of the rehabilitation unit's total inpatient population when determining whether it was in compliance with the 75 Percent Rule."[20]  If BCH placed acute care patients in beds in an exempt rehabilitation unit on 14 occasions in 1998, 122 occasions in 1999, 25 occasions in 2000, and 5 occasions in 2001, she "would not have approved of [BCH]'s placement of overflow patients in the exempt rehabilitation unit on such a frequent basis," and would have recommended to HCFA/CMS that BCH's exemption be revoked."[21]

On February 14, 2001, Mr. Robinson, Chief Financial Officer of BCH, sent a letter to Ms. Theus informing her that five overflow patients were admitted for an overnight stay in the BCH ARU between January 30, 2001 and February 6, 2001, but that "[t]hese individuals will be billed as medical patients within the DRG system."[22]  Also, in a letter dated April 14, 2000, addressed to BCH's Compliance Officer David Deaton, Dr. Kersulis asked Mr. Deaton to address the

---

[19]Plaintiffs' Exhibit 2, Declaration of Wanda Theus, p.2.

[20]*Id.*

[21]*Id.* at 3.

[22]Plaintiffs' Exhibit 2, Declaration of Wanda Theus, Exhibit 8 at BAX 100230.

compliance issue regarding acute care medical/surgical patients being overflowed to BCH ARU beds.[23]  Dr. Kersulis states "This is permitted as long as those patients are placed in and added to the 25% category of the Medicare 75-25 listing."

In response to Plaintiffs' allegations, Defendants state that RehabCare's "internal guidance and educational and training materials are not legal requirements and do not establish the meaning of the rules and regulations," and "are simply evidence of RehabCare's efforts to educate its employees and ensure compliance."  The Court agrees that RehabCare's internal guidance and educational and training materials do not dictate the requirements necessary for reimbursement under Medicare, but instead provide guidance as to the hospital's organization and management.  Thus, the Court is hard-pressed to see how an alleged failure to comply with internal guidance and training materials could show that Defendant *knowingly* submitted a false claim to the federal government.  *See United States ex rel. Schuhardt v. Wash. Univ.*, 361 F. Supp. 2d 992, 1000 (E.D. Mo. 2003), *rev'd in part on other grounds*, 390 F.3d 63 (8th Cir. 2004).

Defendants also argue that Ms. Theus' Declaration is "speculative and irrelevant and does not establish a violation of any rule."  Defendants submit a Second Declaration of Ms. Theus, dated July 14, 2006, which states, "In providing this Declaration and my Declaration of March 22, 2006, I am not authorized to speak on behalf of the Arkansas Department of Health or the State."[24]  Ms. Theus states, "The issue with regard to overflow patients is a certification issue.

---

[23]Plaintiffs' Exhibit 6, Deaton Dep. Exhibit 232.

[24]Defendant Baxter County's Reply in Support of Its Motion for Summary Judgment, Exhibit V (hereinafter "Defendant BCH's Reply Exhibit").

To my knowledge a unit has never been decertified as a result of overflow patients."[25]  Ms. Theus

does "not have a recollection of refusing any request to allow medial surgical patients to

overflow into acute rehabilitation units," and has "never recommended that a hospital's

exemption be revoked."[26]  Ms. Theus also makes it clear that even if she had made a

recommendation for revocation, she does not know which HCFA office would have made the

decision regarding whether to accept the recommendation, who would have made that decision,

whether BCH ARU would have had an opportunity to dispute or appeal such a recommendation

or decision, or the final outcome of such a dispute or appeal.[27]  The Court finds that Ms. Theus'

Second Declaration makes obvious the speculative and unreliable nature of Ms. Theus' first

declaration.

Defendants argue that the overflow patients were not part of the BCH ARU's "inpatient

population," nor were they "served" by the BCH ARU, as required by the plain language of the

75/25 Rule, but were admitted to BCH and served only by BCH.  Plaintiffs admit that overflow

patients were placed in beds at the BCH ARU when beds in the hospital were limited or

overcrowded, for example, during the construction of a new patient tower at the hospital and

during seasons of high pneumonia and illnesses.  Importantly, Plaintiffs admit that "overflow

patients were never admitted as patients in the ARU, but were instead admitted as patients in the

---

[25]Defendant BCH's Reply Exhibit V.

[26]*Id.*

[27]*Id.*

hospital and were treated as patients of the hospital,"[28] "[s]ervices for the overflow patients are

billed under the hospital's provider number," and "[n]one of the services for the overflow

patients are billed under the [BCH] ARU's provider number."[29]  Plaintiffs also admit that

"supplies that were used by the overflow patients in the ARU came from a separate supply

closet," "the professional services of nurses were prorated so that they, in effect, moved the cost

of the services in the ARU to the medical/surgical patients into the medical/surgical cost center,

and "[i]f they needed any rehabilitation services those occurred in the inpatient rehabilitation unit

on a separate floor."[30]  Furthermore, Plaintiffs admit that Defendants did not invoice or receive

any payment for overflow patients at the BCH ARU.[31]  Plaintiffs acknowledge that the Arkansas

Department of Health had the authority to approve the placement of overflow patient in the BCH

ARU under certain circumstances.  The Court notes that the parties do not cite any regulation

providing such authority to individual state health departments.

    Plaintiffs argue that, even though the overflow patients were billed under PPS, by

admitting the overflow patients and allowing them to be placed in BCH ARU beds, BCH

received more funds from Medicare than it would have otherwise received because BCH ARU

---

[28]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 77.

[29]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 85.  *See also* Plaintiffs' Exhibit 14B, Holleman Dep. p. 109 ("even though they might occupy a bed in the ARU, they are, in fact, documented as admitted to the hospital and billed under the hospital provider number, not under the ARU provider number.").

[30]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 80.

[31]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 87.

would have been forced to refuse to admit those patients to the hospital if it had complied with

the anti-commingling provision.  Speculation by Plaintiffs that the BCH ARU would have lost its

PPS exemption and that the hospital would have received less money from Medicare, assuming

that these overflow patients were Medicare patients, if it had turned these patients away is not

sufficient to create a triable issue on a claim under the FCA.  Additionally, it appears to be

undisputed that HCFA/CMS did not provide any formal guidance regarding its interpretation of

the requirement that the BCH ARU "[h]ave beds physically separate from (that is, not

commingled with) the hospital's other beds."  Nor did HCFA/CMS provide any formal guidance

regarding the acceptability of temporary placement of non-rehab patients in rehab beds or the

"exceptions" to the general rules, such as 42 C.F.R. § 412.25(a)(7), that may be made by state

governments, according to the parties.  For these reasons, the Court concludes that summary

judgment is appropriate on this issue as to Counts I through III.

### D.  The 75/25 Rule

#### 1.  Medical Necessity Requirement

Plaintiffs argue that the BCH ARU did not satisfy the 75/25 Rule because an insufficient

number of patients **required** intensive rehabilitation for one of the qualifying conditions.

Plaintiffs state their position as, "[a] patient who, following a [total knee arthroplasty], *required*

intensive rehabilitation for the treatment of the knee, should be classified as a 75% patient only if

the patient also *required* intensive rehabilitation for the treatment of 'polyarthritis," which means

"arthritis in more than one joint." (Emphasis added).  However, Plaintiffs state that "if the only

reason that the patient *required* intensive rehabilitation was for treatment of that knee, that

patient must be classified as a 25% patient." (Emphasis added).[32]

Defendants state that they utilized a bifurcated method for classifying two types of

patients who were admitted to BCH after a single knee replacement (status post total knee

arthroplasty (S/P TKA)): (1) patients without arthritis in other joints, and (2) patients with

arthritis in multiple joints.  Typically, if a patient was admitted to the BCH ARU after a single

knee replacement and his medical records *did not contain any documentation* of arthritis in

another joint (other than the joint that was replaced with a prosthesis), then that patient was

classified in SCOUT[33] as "S/P Knee Replacement" and counted in the 25 percent category.  If a

patient was admitted to the BCH ARU after a single knee replacement and *his medical records*

_____

[32]Plaintiffs assert that Defendants' proposed interpretation of the 75/25 Rule would lead
to absurd results.  In support of this assertion, Plaintiffs rely on a hypothetical posed to Dr. Leon
Reinstein about his view of a situation where an intensive rehabilitation unit had a total
population of 10 patients, all of whom had strokes (one of the 10 qualifying conditions). *See*
Plaintiffs' Exhibit 23, Reinstein Dep. p. 98-101. Plaintiffs assert that Dr. Reinstein was asked to
assume that the patients "were moved over to the inpatient rehabilitation facility with no medical
justification whatsoever; it was just simply to make more money.  So you have five patients in
the unit who have strokes and the need for intensive therapy and five for whom it is, medically
speaking, completely inappropriate." *Id*.  Dr. Reinstein stated that the unit would qualify for the
exemption because "[t]he patients - the diagnosis that the patient has is stroke, and stroke is on
the approved list.  It's my understanding that to meet the 75 percent rule, you simply look at the
admitting diagnosis," and it does not make any difference whether these patients required
intensive rehabilitation to meet the 75 percent rule. *Id*.
   However, Plaintiffs omit the fact that in the hypothetical posed it appears that the "five
patients in the unit who have strokes . . . for whom it is . . . medically . . . inappropriate" were
assumed to be comatose and could be treated with intensive inpatient therapy through "coma
stimulation programs."  Plaintiffs also omit the fact that in this hypothetical it was assumed that
the five comatose patients were receiving intensive inpatient therapy through a coma stimulation
program in the "acute care unit" when "they were moved over to the inpatient rehabilitation
facility."  Plaintiffs' hypothetical is unclear.

[33]SCOUT was software used by RehabCare's rehabilitation units prior to 2002 to collect
and analyze data about patients admitted to the units.

*included documentation of arthritis in multiple joints*, that patient was classified in SCOUT as "osteoarthritis," which was used as a proxy for "polyarthritis" by the Defendants because "polyarthritis" is not an ICD-9 term contained in the SCOUT database, and counted in the 75 percent category.  Plaintiffs state that their position differs from Defendants' position in that Defendants placed patients in the 75 percent group if they simply **had** one of the ten conditions, regardless of whether the patients **required** intensive rehabilitation for one of the ten conditions.  Specifically, the "medical necessity" debate centers around whether a patient classified in the "polyarthritis" category, who had just undergone a single knee replacement, had to have "symptomatic" arthritis in other joints, aside from the replaced joint, or have "documentation" of arthritis in other joints in order for the patient to "require intensive rehabilitation" for "polyarthritis," and therefore, be classified in the 75 percent category.

However, Defendants contend, even if Plaintiffs' interpretation of the 75/25 Rule is correct and the regulation incorporates such a "medical necessity" requirement, Plaintiffs cannot establish that BCH ARU's certifications of compliance were "knowingly" false because the 75/25 Rule is vague, ambiguous, and subject to multiple reasonable interpretations.  "[T]here is no evidence of fraud if the defendant's interpretation of the applicable regulations is reasonable even though incorrect."  *Schuhardt*, 361 F. Supp. 2d at 1005, *rev'd in part on other grounds*, 390 F.3d 63 (8th Cir. 2004) (citing *United States v. Whiteside,* 285 F.3d 1345, 1350-1351 (11th Cir. 2002); *United States v. Adler,* 623 F.2d 1287, 1289 (8th Cir. 1980)).  Furthermore, summary judgment in favor of a FCA defendant is appropriate when the regulations at issue are ambiguous, such that no reasonable jury could find the defendant satisfied the element of "knowingly" submitting a false claim.  *See, e.g., Luckey v. Baxter Healthcare Corp*., 2 F. Supp.

2d 1034, 1048-49 (N.D. Ill. 1998) (citing *United States v. Garfinkel*, 29 F.3d 1253, 1257 (8 th

Cir. 1994); *United States v. Adler,* 623 F.2d 1287, 1289 (8th Cir. 1980); *United States ex rel.*

*Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977), cert denied, 434 U.S. 1035, 98 S.

Ct. 768 (1978); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 884

(D. Md. 1995); *United States v. Napco Int'l Inc.*, 835 F. Supp. 493, 497-98 (D. Minn. 1993)).  In

support of its assertion that the 75/25 Rule is vague, ambiguous, and subject to multiple

reasonable interpretations, Defendant RehabCare submits an examination of the history of the

75/25 Rule, including HCFA/CMS's actions and inactions with respect to the Rule, and the

ultimate changes to the Rule.

HCFA/CMS published the final regulation containing the 75/25 Rule on September 1,

1983.  On June 7, 2002, HCFA/CMS suspended enforcement of the 75/25 Rule to "determin[e]

whether changes were needed to the regulation[] and the operating procedures that govern how

compliance with the regulation is verified."  Medicare Program; Inpatient Rehabilitation Facility

Prospective Payment System for FY 2004, 68 Fed. Reg. 26,786, 26,791 (May 16, 2003) (to be

codified at 42 C.F.R. pt. 412).  In September of 2003, HCFA/CMS recognized "that one of the

listed conditions in the existing regulation at § 412.23(b)(2), specifically polyarthritis, has been a

source of confusion and is acknowledged by many not to represent any clearly defined clinical

condition."  Medicare Program; Changes to the Criteria for Being Classified as an Inpatient

Rehabilitation Facility, 68 Fed. Reg. 53,266, 53,271 (September 9, 2003) (to be codified at 42

C.F.R. pt. 412).  In 2003, HCFA/CMS "acknowledge[d] that the industry has interpreted

polyarthritis to include hip and knee joint replacement cases and these should be included in the

conditions counted in existing § 412.23(b)(2)."  *Id*.  Plaintiffs concede that the rehabilitation

industry "is upset that HCFA/CMS has resisted industry pressure to abolish the 75/25 Rule."

HCFA/CMS went on to state that "[a]lthough some joint replacement cases are currently being

treated in IRFs, we are not aware of any research that identifies the factors determining which

patients are more appropriately treated in the intensive inpatient rehabilitation setting provided in

an IRF." *Id*. at 53,271-53,272.  Therefore, HCFA/CMS proposed to "remove this term from the

list of 10 conditions and substitute instead 3 more clearly defined arthritis-related conditions, as

specified above in the introduction to section II of this preamble, that comprise the range of

diagnoses that the term 'polyarthritis' was intended to encompass." *Id*. at 53,271.  HCFA/CMS

explicitly stated that "[a] joint replaced by a prosthesis is no longer considered to have

osteoarthritis, or other arthritis, even though this condition was the reason for the joint

replacement." *Id*. at 53,270.

In May of 2004, HCFA/CMS published the final regulation containing the revised 75/25

Rule, which instructed the fiscal intermediaries about how the 75/25 Rule should be calculated

and added ICD-9 codes to each of the conditions listed in the rule.  Changes to the Criteria for

Being Classified as an Inpatient Rehabilitation Facility, 69 Fed. Reg. 25,752 (May 7, 2004) (to be

codified at 42 C.F.R. pt. 412).  However, in the May 2004 publication, HCFA/CMS stated that it

"know[s] of no CMS policy that states that joint replacements were ever recognized as

polyarthritis.  In addition, for at least the past 5 years, we have met often with industry

representatives and have consistently expressed our position that joint replacements did not meet

the polyarthritis condition used to classify IRFs." *Id*. at 25,764.  "Although industry

representatives have repeatedly urged us to change our interpretation, we believe the agency's

guidance has been consistent and based on the best data available to us." *Id*. at 25,764.

Plaintiffs also submit an excerpt from the Medicare Hospital Manual ("MHM"), which states, "A hospital level of care is required by a patient needing rehabilitative services if that patient needs a relatively intense rehabilitation program that requires a multidisciplinary coordinate team approach to upgrade his ability to function.  There are two basic requirements which must be met for inpatient hospital stays for rehabilitation care to be covered: [1] The services must be reasonable and necessary (in terms of efficacy, duration, frequency, and amount) for the treatment of the patient's condition; and [2] It must be reasonable and necessary to furnish the care on an inpatient hospital basis, rather than in a less intensive facility such as an SNF, an SNF level of care in a swing bed hospital, or on an outpatient basis."  MHM at § 211(A).[34]   Also, before a patient is admitted to a rehabilitation hospital for treatment, a preadmission screening is normally done, which determines "if a patient is likely to benefit significantly" from the program.  MHM at § 211(B).[35]

Furthermore, Plaintiffs argue that in late 2001, RehabCare distributed a document called "Arthritis Protocol" to its program directors, which stated:

> **Reason for Admission**
> • Ask yourself – why does this patient need rehab?
> • Can't code as arthritis just because there is a [history] of arthritis
>
> **Verification of Diagnosis**
> • Determined by physician
> • Must reflect what team is actually treating
> • Same [diagnosis] should be documented on all assessments and treatment plan

---

[34]Plaintiffs' Exhibit 45A, p. 10 at BAX 105607.

[35]*Id.*

• Develop system to verify [diagnosis] entered in computer is agreed upon by Physician.[36]

Once again, RehabCare's internal guidance and educational and training materials do not dictate the requirements necessary for reimbursement under Medicare, and therefore, fail to show that Defendant *knowingly* submitted a false claim to the federal government.  *See Schuhardt*, 361 F. Supp. 2d at 1000.  Furthermore, it is not entirely clear when the document was distributed, as the possible creator of the document does not recall whether she actually created the document or when it was created.[37]

Defendants also argue that it took reasonable steps to ensure that the BCH ARU was in compliance with the 75/25 Rule when the issue was brought to its attention by Plaintiffs. Defendants state that they conducted three reviews of the BCH ARU and the 75/25 Rule in late 1999 and early 2000 – RehabCare's internal review, BCH's internal review, and the independent external review.  Plaintiffs admit that in response to Kersulis' and Wilson's complaints, BCH performed an internal review of the BCH ARU discharges during 1999.[38]  It appears that Patty Orr, the Director of BCH's Medical Records Department, Belinda Aaron and others participated in the review of 11 charts of patients who were discharged from the BCH ARU in 1999 with a rehabilitation diagnosis of "osteoarthritis," which was counted in the 75 percent category in

---

[36]Plaintiffs' Exhibit 15A, Ickler Dep. p. 142-43 & Exhibit 125; Plaintiffs' Exhibit 5D, Bianchi Dep. Exhibit 151 p. 2.

[37]Plaintiffs' Exhibit 19, Maynard Dep. p. 106-107.

[38]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 61.

SCOUT.[39]  Ten of the patient charts were selected at random, and one chart was selected at the

suggestion of an employee.[40]  Ms. Orr determined that all 11 rehabilitation diagnoses were

supported by documentation in the patient's medical records.[41]  Plaintiffs argue that there is no

record as to how the review of the 11 patient charts was conducted and that Belinda Aaron, who

was accused of the misconduct, participated in it.

It is also undisputed that in response to Kersulis' and Wilson's complaints, RehabCare

conducted its own internal review of the BCH ARU.[42]  Bill McClure, RehabCare's Program

Consultant, noted his findings of direct evidence of "osteoarthritis" or rheumatoid arthritis in 7 of

the 18 medical records that he reviewed and he recommended to the BCH ARU that single knee

replacement patients with documented arthritis could be included in the 75 percent category.[43]

Plaintiffs also admit that in 2000, Kersulis met with Erixon, BCH's CEO, to reiterate his

concerns about BCH ARU's compliance with the 75/25 Rule, which resulted in Erixon ordering

Deaton to commission an external review of the BCH ARU and the 75/25 Rule.[44]  Erixon

contacted RehabCare and requested that Kersulis' termination be postponed pending the external

---

[39]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 61 and internal citations therein.

[40]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 61.

[41]*Id.*

[42]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 62.

[43]*Id.*

[44]*Id.* at ¶ 64.

review, and RehabCare agreed.[45]  Deaton contacted Harold Simpson, BCH's outside counsel, to

perform the external review.[46]  Simpson engaged Mary Knapp, a clinical specialist, to conduct a

review of a random sample of charts from the BCH ARU for the year 1999.[47]  Of the 43 patients,

23 of the patients met the "exact criteria related to these [75 percent] conditions."[48]  "14 cases fell

under the condition of 'arthritis' based on documentation in the clinical record" where the patient

was recovering from a total hip or knee replacement as a result of their arthritis.[49]  Knapp stated,

"According to rehabilitation experts and standards of practice in an IRU, the recovery from a

total joint replacement as the treatment of arthritis placed that patient into one of the 10

conditions identified above. . . . The comprehensive rehabilitation industry has a longstanding

acceptance of individuals such as [those recovering from a joint replacement as a result of

arthritis] being admitted to an IRU and falling within the 10 rehabilitation conditions."[50]  Six

cases did not meet the criteria established in the HCFA 10.[51] Plaintiffs argue that McClure and

Knapp used the wrong standard for determining whether the BCH ARU was in compliance with

the 75/25 Rule and that there is no evidence indicating which patient charts McClure reviewed,

or what the documentation showed.

---

[45]*Id*. at ¶ 65.

[46]*Id*. at ¶ 68.

[47]*Id*. at ¶ 68.  Plaintiffs note that the sample of patient charts that Knapp reviewed excluded any "overflow patients."

[48]Plaintiffs' Exhibit 18, Knapp Dep. Exhibit 4.

[49]*Id.*

[50]*Id.*

[51]*Id.*

Importantly, Plaintiffs admit that prior to 2002, HCFA/CMS never issued formal guidance to either the provider community or to the fiscal intermediaries regarding the 75/25 Rule, the definitions of the HCFA 10 conditions, or the interpretation of the term "polyarthritis." Despite this admission, Plaintiffs contend that the language of the 75/25 Rule spoke for itself.[52] The Court finds that the 75/25 Rule did not unambiguously speak for itself and was subject to multiple reasonable interpretations. *Schuhardt*, 361 F. Supp. 2d at 1005, *rev'd in part on other grounds*, 390 F.3d 63 (8th Cir. 2004). Even HCFA/CMS recognized that polyarthritis had been a "source of confusion and is acknowledged by many not to represent any clearly defined clinical condition," and is interpreted by industry to include knee joint replacement cases. Medicare Program; Changes to the Criteria for Being Classified as an Inpatient Rehabilitation Facility, 68 Fed. Reg. 53,266, 53,271 (September 9, 2003) (to be codified at 42 C.F.R. pt. 412). The regulation at issue here is ambiguous.

The Court finds that Plaintiffs have not presented adequate evidence of fraud to permit a jury finding in their favor. Defendants' interpretation of the applicable regulations was reasonable, even if it was incorrect. Therefore, a reasonable jury could not find that the Defendants satisfied the element of "knowingly" submitted a false claim. Summary judgment as to Counts I through III is granted with regard to this issue.

Plaintiffs further argue that "[e]ven if the provisions are ambiguous, if Defendant certified compliance with the regulation *knowing* that the HCFA interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the HCFA

_____

[52]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 15.

interpreted it, any possible ambiguity of the regulations is water under the bridge." *Minnesota*

*Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002)

(emphasis added).  This case is distinguishable from *Allina*.  There, the Court specifically stated,

"However, it is important to remember that the standard for liability is knowing, not negligent,

presentation of a false claim." *Id.*  In *Allina*, the "alleged ambiguity [was] limited to the meaning

of the requirement in the 1992 regulation 42 C.F.R. § 414.46(c)(2)(ii), that an anesthesiologist

must be 'continuously involved' in a case in order to have personally performed an anesthesia

case in which an anesthetist was also 'involved.'" *Id.* at 1053.

While the *Allina* Court stated that "up until 1993, while there may have been some

uncertainty about the interpretation of 'continuously involved,' the defendants were on notice of

the possibility that they were expected to be present with the anesthetist in order to represent that

they had personally performed a case." *Id.*  Such notice was received when HCFA provided a

memorandum, relayed to the provider community in September 1993, stating:

> It has been reported that anesthesiologists will bill using the AA modifier even
> though they are outside the operating room performing other activities, such as
> pain blocks, doing pre or post operative evaluations, or administering and /or
> monitoring a labor epidural. For the anesthesiologist to bill using the AA modifier
> [for personally performed case] under these circumstances, he must be physically
> present in the operating suite while the [anesthetist] is attending to the case. If the
> anesthesiologist is not continuously involved with the case, then it is considered
> neither personally performed nor medically directed.

*Id.* at 1053-54.  While some defendants attempted to argue that they "relied on this memo in

forming the belief that they could bill for personally performing cases despite leaving the

operating room, so long as they were present in the operating suit, which they define[d] as the

area in the hospital where surgery takes place," the Court found several instances in which

32

defendants were not even present in the operating suite or were not available for emergencies in the case.  *Id*. at 1055.  Furthermore, the time frame within which the 1993 HCFA memorandum could have been thought to have given the defendants permission to bill cases as personally performed when they were not immediately involved in the procedure ended when the HCFA published another memorandum in the American Society of Anesthesiologists newsletter of April 1994, a few months after the dissemination of the 1993 HCFA memorandum to the provider community.  *Id*. at 1054.

> This memorandum made it clear that anesthesiologists were not to leave a patient during a personally performed procedure. The memo stated that an anesthesiologist performing *medical direction* of concurrent procedures could "momentarily leave that procedure and perform another physician service" so long as this did not occur during a demanding part of the procedure."  The memo contrasted the requirements for medically directed procedures with those for *personally performed* procedures: "Of course, we have not extended this policy to the case in which the anesthesiologist is personally performing the case. The reason for this is rather obvious. The anesthesiologist who is billing for personal performance of the case must personally perform the case. In theory, there is no one else to hand the case to." The memo concluded by saying that if the anesthetist, rather than the anesthesiologist was actually performing the case, then the anesthetist, rather than the anesthesiologist, should be paid for it.

*Id*. at 1054.

Here, it is undisputed that prior to 2002, HCFA/CMS never issued formal guidance to either the provider community or to the fiscal intermediaries regarding the 75/25 Rule, the definitions of the HCFA 10 conditions, or the interpretation of the term "polyarthritis."  Thus, Plaintiffs' reliance on *Allina* is misplaced, and summary judgment is appropriate.

**2. Inclusion of the "Overflow Patients" in the 25 Percent Category**

Next, Plaintiffs argue that the BCH ARU did not satisfy the 75/25 Rule because the "overflow patients" were not counted as 25 percent patients for purposes of the 75/25 Rule, and if these patients had been included in the 25 percent category, the BCH ARU would not have met the 75 percent requirement of the Rule.  Plaintiffs allege that the BCH ARU was occupied by the following number of "overflow patients:" 14 patients in 1998, 122 in 1999, 25 in 2000, and 5 in 2001.[53]  Defendants contend that the 75/25 Rule requires that the BCH ARU show that it "*served an inpatient population* of whom at least 75 percent required intensive rehabilitation services for the treatment of one or more of the [HCFA 10]."  42 C.F.R. § 412.23(b)(2) (emphasis added).  Defendants state that the 75/25 Rule is irrelevant to "overflow" patients because they were not part of the "inpatient population" that was "served" by the BCH ARU, and the patients were billed under the hospital's provider number, not the BCH ARU's provider number.  Defendants further argue that it is irrefutable that Defendants did not invoice or receive any payment for overflow patients at the BCH ARU, and therefore, Plaintiffs cannot establish any loss to the government.

In support of their assertion that Defendants should have included overflow patients in the 25 percent category of the 75/25 calculation, Plaintiffs rely on the memorandum dated February 21, 1997 from RehabCare Program Director Renee Allen to Jeff Speaks, Chief Operating Officer of BCH, discussed above.[54]  Plaintiffs also note Rick's Shelton's response to

---

[53]Plaintiffs' Exhibit 13, Holdman Dep. p. 15.

[54]Plaintiffs' Exhibit 29C, Speaks Dep. Exhibit 259.

the question of whether he recalled anyone raising the issue of overflow beds on the acute

rehabilitation unit, also discussed and detailed in a previous section.[55]

Plaintiffs also rely on a letter dated February 9, 1998, to Mr. Jeff Speaks from Rick

Shelton, which states:

> I happened upon one issue about which I feel compelled to warn you.  The
> percentage of patients with rehab-related diagnoses was approximately 38%.
> Belinda informed me of the bed shortage crisis and the high incidences of both
> pneumonia and influenza virus in your area.  I understand, but I am not certain
> that the HCFA surveyors will.  If they perform a site visit and find that less than
> 75% of all patients admitted do not have a diagnosis in the ten rehab-related
> categories. [sic]  Violation of the 75/25 Rule would likely result in the immediate
> removal of the PPS exemption for the remainder of your fiscal year under
> prospective pay.  I am aware of a hospital based unit which was surveyed nine
> months into the fiscal year and had a mix of rehab diagnoses at 74.4%.  The PPS
> exemption was immediately pulled and the unit was closed.[56]

As discussed above, Mr. Don Ickler, Program Director for RehabCare, identifies a 75/25

Report dated April 11, 2001 with a note written by him that states, "We also had 6-8 medical

overflow [patients] which are not in this number and do count as "25ers."[57]  He explains that this

note meant that the BCH ARU "had six to eight acute care admissions, not rehabilitation

admissions, acute care patients that were in our beds, our exempt beds.  And those patients,

because they weren't rehabilitation admissions, they were never put into SCOUT, so they are not

in this number [of patients included in the 75/25 Report] anywhere because they're not a

---

[55]Plaintiffs' Exhibit 26, Shelton Dep. p. 184-85.

[56]Plaintiffs' Exhibit 29B, Speaks Dep. Exhibit 261.

[57]Plaintiffs' Exhibit 15A, Ickler Dep. Exhibit 123 at BAX 100232.

rehabilitation admission."[58]  He further clarifies, however, that the "most conservative approach" in calculating the 75/25 Rule would include the number of overflow patients in the total number of patients.[59]  Then, Mr. Icker explains that his understanding of the process is that the State of Arkansas is notified that the BCH ARU is admitting non-rehab patients and that those patients should be billed as an "acute patient only," not as a rehab patient.[60]  "[U]ltimately, . . . the state and HCFA . . . have the authority to rule" that those patients should be included in the 75/25 Rule calculation as 25 percent patients.[61]  Mr. Ickler states that it appears that he never entered the six to eight overflow patients in 2001 into the SCOUT system for purposes of calculating the 75/25 Rule.[62]

Also, Plaintiffs cite the deposition of Ivan Holleman, Corporate Representative of BCH, discussed above, in which he states that he believes that there were nurses who were specifically tasked only to take care of patients in the BCH ARU and that they took care of overflow patients, i.e. the medical/surgical patients that were occupying beds in the BCH ARU.[63]  BCH provided RehabCare with a "face sheet" identifying any overflow patients on the unit.[64]  As stated above,

---

[58]Plaintiffs' Exhibit 15A, Ickler Dep. p. 132-33, Exhibit 123 at BAX 100232.

[59]Plaintiffs' Exhibit 15A, Ickler Dep. p. 133-34.

[60]*Id*. at 134-35.

[61]*Id*. at 135.

[62]*Id*. at 136.

[63]Plaintiffs' Exhibit 14A, Holleman Dep. p. 17-18.

[64]*Id*. at 42-46.

to ensure appropriate documentation and accounting for acute care patients that were placed in rehab unit beds, Mr. Holleman states:

> "Belinda Aaron was given each day a face sheet which is essentially the information on the patients who are medial/surgical patients for purposes Annette Cully thought of entering and documenting into the SCOUT system.  We had two census tracking forms, one associated with ARU, one associated with med/surg unit that was adjacent to it.  The med/surg were accumulated and reported on the med/surg side of that equation, med/surg side with the reporting.  Annette worked to assure that supplies for the medical/surgical patients were taken from a specific supply closet and that they were not taken from a supply closet for the ARU patients.  Linens were separate.  And she routinely prorated the staffing if there were overflow patients."[65]

Mr. Holleman states that BCH's concern regarding overflow of patients into the physically separate ARU beds was that the costs needed to be allocated appropriately and that the patients needed to be accounted for appropriately.[66]

Defendants state that "overflow patients" are "medical/surgical patients that are admitted to the hospital, but placed in ARU beds in times of high census and overcrowding in the hospital."[67]  Importantly, "even though they might occupy a bed in the ARU, they are, in fact, documented as admitted to the hospital and billed under the hospital provider number, not under the ARU provider number."[68]  On February 14, 2001, Mr. Robinson, Chief Financial Officer of BCH, sent a letter to Ms. Theus informing her that five overflow patients were admitted for an

---

[65]*Id*. at 42-43.

[66]*Id*. at 42.

[67]*See* Memorandum of Law in Support of Defendant RehabCare's Motion for Summary Judgment, p. 14.

[68]Plaintiffs' Exhibit 14B, Holleman Dep. p. 109.

37

overnight stay in the BCH ARU between January 30, 2001 and February 6, 2001, but that "[t]hese individuals will be billed as medical patients within the DRG system."[69]

In an April 14, 2000 letter to BCH's Compliance Officer David Deaton, Dr. Kersulis asked Mr. Deaton to address the compliance issue regarding acute care medical/surgical patients being overflowed to BCH ARU beds.[70]  Dr. Kersulis states "This is permitted as long as those patients are placed in and added to the 25% category of the Medicare 75-25 listing.  I am concerned that those overflow patients may not have been added to the 25% category throughout 1998 and 1999."  However, Dr. Kersulis also agreed that at the time he wrote the letter he was not "sure one way or the other what exactly the rule was on overflow patients," indicating that the reason he was "reasonably certain" that "RehabCare had violated the 75/25 Rule with respect to overflow patients" was "because Belinda [Aaron] was upset about that."[71]

Dr. Leon Reinstein, Defendant RehabCare's expert, testifies that at Sinai Hospital of Baltimore, where he is the Medical Director of the Comprehensive Inpatient Rehabilitation Unit, overflow patients occupying beds in the acute rehabilitation unit are not counted for purposes of the 75/25 Rule because the acute rehabilitation unit is not treating them.[72]  The patients are billed as if they were sitting in a medical or surgical designated bed because they are under the care of a

---

[69]Plaintiffs' Exhibit 2, Declaration of Wanda Theus, Exhibit 8 at BAX 100230.

[70]Plaintiffs' Exhibit 6, Deaton Dep. Exhibit 232.

[71]Plaintiffs' Exhibit 16B, Kersulis Dep. p. 222.

[72]Defendant RehabCare's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment, Exhibit B, Reinstein Dep. p. 102 (hereinafter "Defendant RehabCare's Exhibit").

physician from the department of medicine or surgery and are not receiving therapy.[73]  He further

states that he is not aware of any communication from HCFA/CMS or any fiscal intermediary

indicating that this accounting of overflow patients is incorrect.[74]

Importantly, Plaintiffs submit the Medicare State Operations Manual, which states, "This

finding is based on the medical conditions of all (i.e. Medicare and non-Medicare) patients who

occupy the beds assigned to the physically separate unit.  The medical condition of all patients

treated in the unit is considered."[75]  However, the Court notes that the quoted section specifies

that "the medical condition of all patients *treated in the unit* is considered."  Similarly, section

3104.B states, "For purposes of determining whether the 75 percent rule is met, the SA considers

the medical condition of all patients (i.e., Medicare and non-Medicare) *treated* in the hospital.

*The SA uses either the number of admissions or the number of discharges during a cost reporting*

*period*."[76]  Plaintiffs have not shown that the overflow patients were "treated" in the unit or that

those patients were ever admitted to or discharged from the unit.  As discussed above, Plaintiffs

admit that "overflow patients were never admitted as patients in the ARU, but were instead

admitted as patients in the hospital and were treated as patients of the hospital,"[77] "[s]ervices for

the overflow patients are billed under the hospital's provider number," and "[n]one of the

---

[73]Defendant RehabCare's Exhibit B, Reinstein Dep. p. 102.

[74]*Id.*

[75]Plaintiffs' Exhibit 42, Medicare State Operations Manual § 3106.C.

[76]*Id.* at § 3104.B (emphasis added).

[77]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 77.

services for the overflow patients are billed under the [BCH] ARU's provider number."[78]

Plaintiffs also admit that "supplies that were used by the overflow patients in the ARU came

from a separate supply closet," "the professional services of nurses were prorated so that they, in

effect, moved the cost of the services in the ARU to the medical/surgical patients into the

medical/surgical cost center, and "[i]f they needed any rehabilitation services those occurred in

the inpatient rehabilitation unit on a separate floor."[79]  Furthermore, Plaintiffs admit that

Defendants did not invoice or receive any payment for overflow patients at the BCH ARU.[80]

Therefore, the Court finds that summary judgment on this issue is also appropriate.[81]

## IV.  Defendant Baxter County Regional Hospital's Motion for Summary Judgment - Count IV and Alternative Motion for Partial Summary Judgment

In Count IV of the Second Amended Complaint, Jimmy Wilson contends that he is

entitled to redress pursuant to 31 U.S.C. § 3730(h), which provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in
> any other manner discriminated against in the terms and conditions of
> employment by his or her employer because of lawful acts done by the employee
> on behalf of the employee or others in furtherance of an action under this section,
> including investigation for, initiation of, testimony for, or assistance in an action

---

[78]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 85.  *See also* Plaintiffs' Exhibit 14B, Holleman Dep. p. 109 ("even though they might occupy a bed in the ARU, they are, in fact, documented as admitted to the hospital and billed under the hospital provider number, not under the ARU provider number.").

[79]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 80.

[80]Plaintiffs' Responses to Defendant RehabCare's Statement of Undisputed Material Facts, ¶ 87.

[81]Because the Court grants summary judgment on Counts I through III on other grounds, the Court need not consider BCH's lack of imputation arguments.

filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

Wilson alleges that "[u]pon discovering the Defendants' unlawful acts," "Wilson confronted management of the Defendants about the unlawful nature of the Defendants' actions." He further states that "[i]n so doing, Wilson was engaging in lawful acts in furtherance of an action to be filed under the False Claims Act," and that because of his lawful acts, his employer, BCH, terminated him.  Wilson alleges that these actions caused actual damages, including lost wages and other special damages.

"The FCA whistleblower statute protects employees who are 'discharged ⋯ because of lawful acts done by the employee ⋯ in furtherance of [a civil action for false claims].'" *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004) (citing 31 U.S.C. § 3730(h); *Wilkins v. St. Louis Hous. Auth.,* 314 F.3d 927, 932-33 (8th Cir. 2002)).  "In order to prove retaliation under this section, a plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity."  *Id.*

If the plaintiff can establish a connection between the employee's engaging in protected activity and the employer's subsequent adverse employment action, the burden shifts to the employer to demonstrate that the same action would have been taken even if the employee had

not engaged in the protected activity.  *See Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848,

850-51 (8th Cir. 2000) (citing S. Rep. 99-345, at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N.

5266, 5300, which provides, "One, the whistleblower must show the employer had knowledge

the employee engaged in 'protected activity' and two, the retaliation was motivated, at least in

part, by the employee's engaging in protected activity. Once these elements have been satisfied,

the burden of proof shifts to the employer to prove affirmatively that the same decision would

have been made even if the employee had not engaged in protected activity.").

In *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 291 (4th Cir.

2004), the Fourth Circuit discussed liability of employers in the Title VII and ADA context[82]

stating:

> Regarding adverse employment actions, an employer will be liable not for
> the improperly motivated person who merely influences the decision, but
> for the person who in reality makes the decision. This encompasses
> individuals who may be deemed actual decisionmakers even though they
> are not formal decisionmakers, such as in *Reeves,* where the husband of
> the formal decisionmaker wielded absolute power within the company,
> and in *Shager,* where the supervisor's reports and recommendation were
> merely rubber-stamped by the formal decisionmaking committee. In sum,
> to survive summary judgment, an aggrieved employee who rests a
> discrimination claim under Title VII or the ADEA upon the discriminatory
> motivations of a subordinate employee must come forward with sufficient
> evidence that the subordinate employee possessed such authority as to be
> viewed as the one principally responsible for the decision or the actual
> decisionmaker for the employer.

In *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1056-1057 (N.D. Ill. 1998), the

district court stated that the plaintiff "must establish that [the defendant] possessed the retaliatory

---

[82]*See, e.g., Wilkins v. St. Louis Housing Authority*, 314 F.3d 927 (8th Cir. 2002) (applying the Title VII "reasonable belief" standard to 31 U.S.C. § 3730(h) claim); *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848 (8th Cir. 2000) (turning to Title VII law for guidance on whether attorney fees are available in mixed motive retaliation claims under 31 U.S.C. § 3730(h)).

intent when discharging her, in violation of § 3730(h)."  (citing *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.,* 123 F.3d 935 (6th Cir.1997) ("§ 3730(h) provides relief only if the whistle blower can show by a preponderance of the evidence that the employer's retaliatory actions resulted 'because' of the whistle blower's participation in a protected activity," but courts "have given the internal whistle blower a heavier burden to carry when seeking relief under § 3730(h)").  The employee "bears the burden of producing evidence that demonstrates the probability, not the mere possibility, of a discriminatory motive."  *Id.*

BCH argues that even assuming that sufficient evidence exists supporting Wilson's claim that he was engaging in protected conduct and that BCH was aware of that conduct, there is insufficient evidence that Wilson's employment was terminated "because of" that conduct.  BCH contends that the evidence demonstrates that Wilson's employment was terminated not because of anything he did do or did not do, but instead because of purely external factors.  Defendant BCH contends that Wilson "simply disagrees with [BCH]'s business decision not to terminate on the basis of seniority and instead contends that [BCH] should have laid off people with less experience.  In his deposition, Wilson states "I would think that most facilities would look at seniority."[83]

The following facts are undisputed:  The Balanced Budget Act of 1997 significantly changed the reimbursement for BCH and other hospitals.  Unlike other hospitals, BCH had not been preparing for these cutbacks and had to adjust for them in a relatively short period of time.

---

[83]Defendant BCH's Exhibit A, Wilson Dep. p. 194.

This required drastic changes.[84]  BCH had to learn about productivity standards.  On March 1, 2000, BCH CEO Steve Erixon sent a letter to all employees, including Wilson, addressing Baxter's financial position.[85]  The letter specifically stated that the Balanced Budget Act passed the previous year caused a $2.5 million loss at BCH, and that in 2000, BCH expected a loss of approximately $5 million if it did not make changes.  The letter goes on to discuss the potential of layoffs at BCH.  When this letter came out, Wilson knew that BCH was going to make budget cuts and that layoffs were possible.[86]  If the hospital did not make any significant reductions it was going to lose $2 to $3 million each year and its bond payments would be in jeopardy.[87]

In late 1999, BCH hired Cambio as a consulting company to provide an interim CFO, to conduct a review of the hospital's operations, and to review ways to improve the hospital's finances.[88]  Cambio looked at the hospital's entire operations, but primarily staffing and the number of employees that it had.[89]  As a result of its work, Cambio prepared a report which included productivity standards.[90]  Cambio looked at staffing in all departments and concluded

---

[84]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 86, 87.

[85]*Id.  See also* Defendant BCH's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment, Exhibit R at PLTFS368 (hereinafter "Defendant BCH's Exhibit").

[86]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 88.

[87]*Id.* at ¶ 89.

[88]*Id.* at ¶ 90.

[89]*Id.*

[90]*Id.* at ¶ 91.

that BCH had more employees than workload required.[91]   After comparing BCH to other

hospitals of similar size and operation, Cambio identified, for every department, staffing levels,

provided a recommendation for staffing levels, and set productivity standards.[92]   Cambio looked

at every position in all 70 departments in BCH and recommended staffing reductions.[93]   When

the decisions were made to cut positions at BCH, a material part of the decision-making process

was a review of the full-time equivalents ("FTEs"), or the equivalent of hours for a single

employee working full time, at BCH as compared to other hospitals.[94]

       The BCH ARU had too many FTEs for the number of patients received, was classified as

"one of the fattest departments in the hospital in comparing FTEs,"[95] and was one of the most

overstaffed departments.[96]   The BCH ARU had 32.64 FTEs, compared to a minimum paid FTEs

on a national level of 20, a variance of 12.64.  If BCH ARU met the national level, it would

result in an annual salary savings to BCH of $457,200.49.[97]

---

[91]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 91.

[92]*Id*. at ¶ 92, 93.

[93]*Id*.

[94]*Id*. at ¶ 94.

[95]*Id*. at ¶ 95.

[96]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 96.

[97]*Id*. at ¶ 97.

BCH attempted to resolve its overstaffing problem through attrition, and did not fill vacancies, but there was no attrition of therapists in the first few months of 2000.[98]   Hospitals typically have a turnover rate of twenty percent per year, such that if a hospital does not hire people in a given year, it should have a natural attrition rate of twenty percent.[99]   In June of 2000, it became necessary to terminate staff, as it was clear that the problem of overstaffing in the BCH ARU could not be solved by attrition.  BCH realized that positions had to be eliminated, and "[i]t got down to departments that were overstaffed."[100]   Middle-management positions were heavy contenders for layoffs.[101]

Wilson's employment was terminated by BCH on June 6, 2000, as part of BCH's workforce reduction.[102]   During a meeting in Shannon Jenkins' office, Sandra Goldsby explained to Wilson that BCH was experiencing budget problems, was going to eliminate staff, and that his position as Charge Therapist was being eliminated.[103]   In that meeting, Goldsby provided Wilson a letter dated June 6, 2000, which states, "We regret that due to the impact of the Balanced Budget Act your position at BRMC has been eliminated."[104]   After leaving BCH, Wilson gave

---

[98]*Id*. at ¶ 99.

[99]*Id*. at ¶ 103.

[100]*Id*. at ¶ 100, 102.

[101]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 104.

[102]*Id*. at ¶ 106.

[103]*Id*. at ¶ 107.

[104]*Id*. at ¶ 108.

this letter to subsequent employers as proof that his position had been eliminated at BCH because of the Balanced Budget Act.[105]  In fact, Wilson represented that he left BCH because he was laid off due to "a downsizing of the department" in interviews with subsequent employers.[106] Numerous other positions were eliminated on the same day that Wilson was terminated.[107] Wilson's position as Charge Therapist was never filled, and Baxter has not had a Charge Therapist in the BCH ARU since that time.[108]  By August 1, 2000, Wilson was hired as Director of Physical Therapy at Russell Regional Hospital in Russell, Kansas.[109]  Wilson was fired on October 18, 2000.[110]  Wilson is currently working at St. John's Regional Hospital in Joplin, Missouri.[111]

Plaintiff Wilson contends that his position was eliminated because BCH and RehabCare were retaliating against him for accusing them of engaging in fraudulent conduct.  Wilson contends that BCH considered him to be an "exemplary employee."  Robert Wike, the Director of Physical Therapy at BCH, hired Mr. Wilson and described him as "a good physical therapist, [] good with patients, good with patient's care, good with staff . . . [and] a good administrative-

---

[105]*Id*. at ¶ 108.

[106]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 113.

[107]*Id*. at ¶ 110.

[108]*Id*. at ¶ 109.

[109]*Id*. at ¶ 114.

[110]*Id*. at ¶ 117.

[111]Plaintiffs' Responses to Defendant BCH's Statement of Undisputed Material Facts, ¶ 121.

type person."[112]  In Wilson's 1997 evaluation, which Wilson received on January 16, 1998,

Belinda Aaron, RehabCare's on-site Program Director, gave Wilson a score of 2.98 out of a

possible 3.00, stating, "Outstanding performance.  Jimmie is always willing to 'go the extra mile'

and continues to present creative approaches to improving staff competency and patient care."[113]

In his evaluation for 1998, which Wilson received on December 31, 1998, Aaron gave Wilson a

score of 98 out of a possible 100, and stated, "Jimmie is an outstanding therapist and leader.  He

continually seeks process improvement in the program.  He works diligently towards improved

interdepartmental and inter-disciplinary relations."[114]

        Wilson argues that in December 1999, he told Speaks that he believed RehabCare and

BCH were committing Medicare fraud.[115]  However, the deposition testimony cited specifically

states that Wilson "had concerns about the admission diagnosis," "expressed concerns that in

regard to patients with arthritis, whether it could be considered polyarthritis," and that Wilson

"didn't think they . . . could be."[116]  Wilson showed Speaks an Admission/Discharge log, and told

Speaks that he did not think that the patients on the log "had the diagnosis that . . . they were

admitted by."[117]  Speaks responded that he would have it checked out.[118]  The next day, Speaks

---

[112]Plaintiffs' Exhibit 34, Wike Dep. 7, 24-25.

[113]Plaintiffs' Exhibit 4, Aaron Dep. Exhibit 207.

[114]Plaintiffs' Exhibit 4, Aaron Dep. Exhibit 210.

[115]Plaintiffs' Exhibit 29A, Speaks Dep. p. 99-100.

[116]*Id*. at 99.

[117]*Id*. at 101-02.

[118]*Id*. at 99-100.

told Aaron that Wilson had expressed concerns, and Aaron responded that "it was allowable diagnoses."[119]  Speaks said to Aaron, "let's check on it," and he also asked David Deaton, the compliance officer at that time, "to check on it."[120]  As discussed above, in response to Kersulis' and Wilson's complaints, the Defendants state that they conducted three reviews of the BCH ARU and the 75/25 Rule in late 1999 and early 2000 – RehabCare's internal review, BCH's internal review, and the independent external review.

On an evaluation dated January 18, 2000, Aaron gave Wilson a performance review of 61 out of a possible 100.[121]  Wilson did not sign the evaluation and told Speaks that he "didn't think it was a fair evaluation."[122]  Speaks asked Aaron to "revisit" her evaluation and that "if anything was marked into a negative, to have specifics."[123]  Prior to January 2000, Aaron had stated to Speaks that she "wasn't sure that [Wilson] was supporting her with the therapists. . . [s]pecifically an issue with regard to group therapy."[124]  Aaron issue a revised evaluation, dated January 26, 2000, raising Wilson's evaluation score from 61 to 82.[125]  Once again, Wilson refused to sign the evaluation, and appended his own comments, dated January 27, 2000, stating

---

[119]*Id*. at 102.

[120]Plaintiffs' Exhibit 29A, Speaks Dep. p. 102-03.

[121]Plaintiffs' Exhibit 29A, Speaks Dep. Exhibit 268.

[122]Plaintiffs' Exhibit 29A, Speaks Dep. p. 104-107.

[123]*Id*.

[124]*Id*. at 109.

[125]Plaintiffs' Exhibit 29A, Speaks Dep. Exhibit 269.

I have worked at Baxter Regional for six years.  In those years I have never had a negative comment on a performance eval.  This performance eval is a revised eval after I declined to sign the first one.  This performance eval provides a more accurate picture of my performance and difficulties that are present on the rehab unit.

I feel I have been penalized for performing my responsibility of leading the therapy staff.  I have and will always do my best to safeguard high quality, ethics, and legalities of the therapy staff, while doing my best to be as objective as possible in providing additional assistance as time is available to help the rehab team.

I have no doubt that if I accommodated to all proposed changes by the program director and nursing staff my scores would be higher.  I am not about scores.  I have discussed any difference of opinion in a respectful, professional, and rational manner.  To accommodate to every proposed change, in my opinion, would require me to violate my ethics, principles, and my practice act as a therapist.

Wilson also states that in March 2000, Wilson and Kersulis told some other BCH employees that they were considering filing a *qui tam* lawsuit.[126]  Specifically, Wilson states in his deposition that just after March 1, 2000, there was a meeting of the licensed therapy staff at his home where they discussed the available avenues because "we felt like we were being pushed to do activities that we felt were very wrong," and Dr. Kersulis "informed us about what a *qui tam* was and all of that."[127]

Plaintiff asserts that "[i]t was up to [Belinda] Aaron to choose which position to eliminate within her department."[128]  However, the cited deposition testimony explains that the "senior leadership team" established that a certain number of positions had to be eliminated in the organization to "keep us afloat financially," and then determined how many positions had to be

---

[126]Plaintiffs' Exhibit 35A, Wilson Dep. p. 256-57.

[127]*Id.* at 256.

[128]Plaintiffs' Exhibit 31, Tindall Dep. 35-37.

eliminated within the different departments.[129]   The department heads in those areas were contacted "to work out which specific positions are eliminated within those specific departments."[130]   Ms. Aaron "was consulted about Jimmie Wilson's position," and was in the group meetings where she participated in conversations about the elimination of Wilson's position, as well as other positions.[131]   Mr. Tindall knew that there were some issues between Ms. Aaron and Mr. Wilson concerning Mr. Wilson's complaints regarding Ms. Aaron's "ethical base on how she was approaching satisfying her job responsibilities" "that particularly pertain[] to the 75/25 Rule" and "[u]pgrading total knee replacements."[132]

The Court notes that Mr. Tindall states that he has no specific recollection of Belinda Aaron "having specific input as to what positions would be terminated," but contributed the number of FTEs that the BCH ARU could give up if so required.[133]   He describes Mr. Wilson's position as "a middle level management position," and states, "Unfortunately for Jimmie, he happen to be the holder of that position at the time it was eliminated."[134]   Belinda Aaron, who was not a hospital employee, was not at the meeting in which the determination was made to eliminate the position of charge physical therapist in the acute rehabilitation unit.[135]   Mr. Tindall

---

[129]Id. at 35.

[130]Id.

[131]Id. at 35-36.

[132]Id. at 36-37.

[133]Defendant BCH's Exhibit LL, Tindall Dep. 83.

[134]Id.

[135]Id. at 93.

explained that when the group says that it is going to eliminate a certain position and only one person holds that position, as in Mr. Wilson's case, the question of whether one person or another is terminated becomes "a moot point."[136]  Finally, Mr. Tindall states that the fact that Mr. Wilson had complained about compliance issues and had personality disputes with and ethical complaints about Ms. Aaron had nothing to do with the decision to eliminate his position.[137]  "It was simply a business decision."[138]  "Across the organization lots of assistant directors and clinical supervisors lost positions.  Unfortunately for Jimmie, he happen to hold one of those."[139]

Even assuming that Belinda Aaron played a role in the decision to include Wilson in the reductions in staff, Wilson still cannot meet his burden.  Significantly, Wilson admits that one of the places heavily considered for layoffs hospital-wide was the middle-management position, that his employment was terminated by BCH as a part of BCH's workforce reduction, and that numerous other positions were eliminated on the same day that he was terminated.   Also, Wilson himself represented that he left BCH because he was laid off due to "a downsizing of the department" in interviews with subsequent employers.  Finally, Wilson's position as Charge Therapist was never filled, and BCH has not had a Charge Therapist in the BCH ARU since that time.

Here, as in *Luckey*, BCH has presented sufficient evidence to show that its motives for terminating Wilson were neither improper nor pretextual.  The Court finds that BCH, the

---

[136] *Id*. at 96.

[137] *Id*.

[138] *Id*.

[139] *Id*. at 96-97.

employer, has demonstrated that Wilson would have been terminated due to budget constraints even if Wilson, the employee, had not engaged in protected activity.  Wilson has not produced evidence demonstrating the probability, not the mere possibility, of a discriminatory motive.  Accordingly, we find that Wilson cannot satisfy the elements of a retaliatory *qui tam* action.  The Court grants summary judgment on Count IV.  Because the Court grants summary judgment to Defendant BCH, Defendant BCH's Alternative Motion for Summary Judgment on the issue of damages is denied as moot.

**V.  Defendant RehabCare's Motion to Exclude Expert Reports and Expert Testimony and Defendant BCH's Motion for Adoption**

Because the Court's grant of summary judgment in this matter rests on grounds independent of whether Defendants actually violated the 75/25 Rule, the Court did not need to consider the testimony of Dr. Sowa in reaching its conclusion.  Therefore, Defendant RehabCare's Motion to Exclude Reports and Expert Testimony and Defendant BCH's Motion for Adoption are denied as moot.

<u>**CONCLUSION**</u>

The Court grants summary judgment to Defendant Baxter County Regional Hospital, Inc. as to Counts I through IV and Defendant RehabCare as to Counts I through III.  Therefore, the Court denies as moot Defendant Baxter County Regional Hospital, Inc.'s Alternative Motion for Partial Summary Judgment, Defendant RehabCare's Motion to Exclude Reports and Expert Testimony, and Defendant BCH's Motion for Adoption.

Accordingly,

IT IS THEREFORE ORDERED that the Motion for Summary Judgment filed by Defendant Baxter County Regional Hospital, Inc. (Docket No. 182) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED that the Alternative Motion for Partial Summary Judgment filed by Defendant Baxter County Regional Hospital, Inc. (Docket No. 182) be, and it is hereby, DENIED as moot.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by the Defendant RehabCare Group, Inc. (Docket No. 184) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED that Defendant RehabCare Group, Inc.'s Motion to Exclude Reports and Testimony of Plaintiffs' Expert (Docket No. 218) and Defendant Baxter County Regional Hospital, Inc.'s Motion for Adoption (Docket No. 222) be, and they are hereby, DENIED as moot.

Judgment will be entered separately.

Dated this 29th day of January, 2007.


/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE